**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| ANTHONY ZARA, | Civil Action No. 1:16-cv-5156 |
| Plaintiff, | |
| v. | |
| DEVRY EDUCATION GROUP, INC.; DEVRY MEDICAL INTERNATIONAL, INC.; ROSS UNIVERSITY SCHOOL OF MEDICINE, SCHOOL OF VETERINARY MEDICINE (ST. KITTS) LIMITED; and; and ALEXA FERRARI; | **SECOND AMENDED COMPLAINT** |
| Defendants. | |

Plaintiff ANTHONY ZARA (hereinafter, referred to as "Zara"), by and through his attorney, Jason J. Bach, Esq., of The Bach Law Firm, LLC, hereby complains and alleges against the above named Defendants, and each of them, based upon knowledge, information and a reasonable belief derived therefrom, as follows:

**<u>INTRODUCTION</u>**

This action for monetary damages and injunctive relief filed by Anthony Zara against the defendants DeVry Education Group, Inc., Devry Medical International, Inc., Ross University School of Medicine, School of Veterinary Medicine (St. Kitts) Limited, (hereinafter, referred to as RUSVM) and Alexa Ferrari (hereinafter, referred to as Ferrari) for federal civil rights violations, breach of contract, and other causes of action due to the defendants' arbitrary, unfair, wrongful and unlawful treatment of pursing false allegations against him that culminated in RUSVM's decision to expel the him on April 18, 2016. RUSVM's illegal actions were prompted by unsubstantiated, unverified and retaliatory allegations Ferrari made to both St. Kitts Police and

RUSVM administration following the former couple's break-up, which RUSVM utterly failed to consider prior to lodging the discriminatory investigation and expulsion hearing.

## VENUE & JURISDICTION

1. Jurisdiction is invoked pursuant to 28 U.S.C. § 1331 (questions of federal law) based on Title IX of the Education Act Amendment of 1972, 20 U.S.C. § 1681, et seq (hereinafter, referred to as "Title IX").

2. Subject matter jurisdiction is also invoked pursuant to 28 U.S.C. § 1332 in that there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00, exclusive of interests and costs.

3. This Court has supplementary jurisdiction over Zara's state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims are so related to Zara's federal claims that they form a part of the same case or controversy.

4. Venue is appropriate in this Court under 28 U.S.C. § 1391 as Defendants' administrative offices are located in this District.

## PARTIES

5. Zara is currently a resident of the State of Florida and, at all relevant times, was a student at Ross University School of Medicine, School of Veterinary Medicine (St. Kitts) Limited (hereinafter, referred to as "RUSVM").

6. Defendant RUSVM is a Private Ordinary Company with limited liability located in and incorporated under the laws of Saint Christopher and Nevis. Its academic campus is located in the Caribbean country of St. Kitts.

7. DeVry Education Group, Inc., through its subsidiaries DeVry Medical International, Inc., and Ross University School of Medicine, School of Veterinary Medicine (St. Kitts) Limited, operate RUSVM.

8. DeVry Education Group, Inc., is a corporation organized and existing under the laws of Delaware. DeVry Education Group, Inc.'s administrative and executive offices are located in Downers Grove, Illinois.

9. Defendant Alexa Ferrari (hereinafter referred to as Ferrari), is currently a resident of the State of Tennessee.

## FACTS

### I. Agreements, Representations, Covenants, and Understandings between Parties

10. Zara was a veterinary student at RUSVM who was in his final year, having only one and a half semesters to complete the portion of his program on the St. Kitts campus before he was illegally expelled.

11. Ferrari is a veterinary student at RUSVM who is in her final year, and remains an active student at RUSVM.

12. As required by RUSVM admission, parties agreed to comply with terms outlined in RSVM Academic Catalog (hereinafter Catalog) and Student Handbook (hereinafter Handbook) Student Rights and Responsibilities (hereinafter Rights) and the RUSVM Policy on Sex and Gender Based Misconduct (hereinafter Policy) with respect to conduct and disciplinary matters.

13. Citing the corrupt and untrusting nature of St. Kitts police, RUSVM strongly and routinely encourages students to lodge safety concerns through Campus Security rather than local law enforcement. Campus security maintains an active presence both on campus and at offsite housing to protect RUSVM students while living in St. Kitts.

3

## II. <u>Zara and Ferrari's Relationship</u>

14. During the 2015 academic year, Zara and Ferrari were involved in a consensual, romantic relationship. At the relationship's inception, both parties lived in separate, off-campus housing.

15. Ferrari began residing in Zara's Ocean's Edge apartment with him in April 2015, moving both herself and her possessions to avoid paying costly rent following the loss of her roommate. In this first attempt cohabitating, Ferrari enjoyed financial benefits, living Zara's apartment absent contributing to rent, utilities, and other household expenses. The time cohabitating was tumultuous. Despite breaching lease terms and against Zara's wishes, Ferrari acquired a cat, which provided friction in the living arrangement.

16. In mid-April 2015 while at dinner, Zara asked Ferrari to move out of the apartment. Ferrari pleaded to stay. As Ferrari drove the couple home, she careened off the road and they tumbled down the mountain. Both sustained only very minor injuries but her car was totaled. Zara agreed to her request to provide her transportation once she moved out. She left for one week but resumed residence at Zara's through the end of April.

17. Zara's mother traveled from Florida to St. Kitts at the end of April 2015 to aid Zara's move to a new apartment at the Starboard complex where he planned to live alone. After refusing requests to remove her items from Zara's Ocean Edge apartment prior to lease termination, Zara and his mother also spent considerable time and effort moving Ferrari's things to her newly-acquired neighboring Starboard unit.

18. The couple maintained their relationship while living separately May 2015 through July 2015. They recommenced cohabitation, moving themselves and their possessions into a one-bedroom Starboard apartment with both of their names on the lease.

19. Ferrari became increasing volatile and erratic during their second cohabitation. Citing St. Kitts' general lack of safety, she often returned home early while Zara remained out. Upon arrival, she would secure the doors so that he couldn't gain entry into their apartment when he returned, and he frequently needed to bang and yell to get her attention to unlock the doors. She also resumed acquiring feral cats, resulting in feces and waste accumulating throughout the unit.

20. In October 2015, Zara approached Ferrari about their living arrangement issues and Ferrari responded with physically and emotionally violence. Ferrari bit and struck Zara, leaving physical marks on his body, which is documented in photographs. When he left their apartment, she impermissibly refused Zara reenter for over a week and refused to give him his property.

21. In October 2015, Zara and Ferrari ended their romantic relationship and ceased cohabitating. Although he was no longer living on site, at no time was Zara banned or otherwise forbidden from Starboard apartments.

22. In October 2015, Zara consulted with Albert Du Plessis (hereinafter, referred to Du Plessis), Director, RUSVM Department of Safety and Security, in October of 2015 to discuss the escalating situation with Ferrari and her numerous violent outbursts towards him. RUSVM instructed Zara to remain passive and ignore Ferrari. Despite listening to the reports of violence against Zara, Du Plessis did not record a disciplinary violation against Ferrari. Zara has since complied with RUSVM's advice despite persistent attacks on his character and attempts to communicate.

23. Zara secured new apartment on November 1, 2015 at a different location and replaced items Ferrari refused to return. Zara arranged with Starboard property managers Dave and Laura Wright (hereinafter, referred to as "the Wrights") to remove his name from the lease and obtain his portion of the security deposit.

24.   On December 1, 2015, Zara attended a pre-arranged meeting with the Wrights to retrieve his possessions from the apartment and receive his refund check for his portion of the security deposit.  Ferrari responded explosively and erratically on site, shouting and using strong language.  Zara responded passively as instructed by RUSVM and did not respond.

25.   On or about December 1, 2015, Ferrari commenced pursuing Zara, showing up at his apartment, posting pictures of Zara on social network sites, and verbally spreading lies and rumors about Zara's character and actions throughout the RUSVM community.  Ferrari continued to text and call Zara.  Zara has continued to responded passively as instructed by RUSVM.

**III.  <u>April 6, 2016 False Police Report and Beating by Police</u>**

26. On or around April 6, 2016 and aware of St. Kitts Police propensity for corruptness and violence, Ferrari lodged an entirely false police report regarding Zara's actions towards her.

27. On April 6, 2016, Zara attended dinner followed by studying at a RUSVM classmate Lexi Nichols' Starboard apartment with several RUSVM students, including his new girlfriend Justeen Borrecco.

28. Zara left the apartment around 11:30 p.m. and began walking a short distance to his apartment. Until his brief attempt to leave, Zara was in the company of several RUSVM students the entire night.

29.   After walking only a few yards towards home, Zara began walking back to the apartment because he heard noises and his name, and upon looking, saw several militarized St. Kitts police officers wielding machine guns.

30. Zara returned to the apartment, where police accosted him and told him he was going to be arrested based on a phone complaint that Zara threating to harm someone.  One of the officers told him that Ferrari filed the complaint.

31. Perplexed, Zara immediately attempted to clarify his whereabouts that evening and physically stepped back from the police with raised his arms above his head to provide assurance that he was neither armed nor attempting to strike the police.

32. The police officers charged Zara, threw him to the ground and began to beat him. Fearing the police would kill him, Zara flailed and screamed out during the attack and attempted to run away.

33. Police continued to pursue Zara as he tried to save himself, again knocking him down and kicking his face, sides, knees, and back. Police smashed Zara's face into the road. They dragged Zara across the gravel road, tore off his shirt and bloodied his face and body. Police struck him with a club as they pushed him into the police car. Zara's attack left him with bruises, bloody nose, cuts and scrape on arms and legs, and a potential concussion.

34. During the attack, Police told RUSVM witnesses at the attack that recording the scene was illegal and required they delete any videos taken. Any attempts witnesses took to help Zara during the attack were met with threats of arrest.

35. Police took Zara to the St. Kitts police station and left him in a jail cell.

**IV. <u>Defendant RUSVM's Police and Internal Disciplinary Involvement</u>**

36. Zara's mother, notified by RUSVM students who witnessed the attack, attempted to reach RUSVM security to determine Zara's whereabouts and safety immediately after his arrest but was unsuccessful in making contact.

37. Fearing for her son's safety, Zara's mother contacted US Embassy officer Shane Deckman, who arranged with RUSVM security person Arthur Willis to determine Zara's state and safety. RUSVM Security Officer Warner subsequently reported to US Embassy that witnessed

Zara was in the jail cell, unharmed and wearing a shirt. US Embassy relayed the information to Zara's mother.

38. At 9:44am the following day, RUSVM agent Du Plessis contacted Zara's mother and reassured her he had been to the jail and saw Zara, and reassured her that Zara suffered no injuries.

39. Despite earlier calls with security regarding Zara's state where agents repeatedly claimed to see Zara in jail, Zara's mother spoke with Dean Dr. St. Jean and Mr. Fazio at 10:40 am, who specifically explained that "school remains at arm's lengths from local authorities and does not interfere with its process. The school is not permitted to see students who are arrested and in jail" because it is not their "protocol".

40. In immediate contradiction to Dr. St. Jean's hands-off assertion, Mr. Fazio then told Zara's mother he and Du Plessis saw police video of Zara's arrest.

41. On April 8, 2016, Zara was released on bail.

42. Zara's mother secured multiple promises that RUSVM would facilitate Zara with prompt medical care in relation the April 6, 2016 police abuse. Nonetheless, Zara was denied promised medical treatment until Tuesday, April 12, 2015.

43. On Monday, April 11, 2016, Zara was stopped after class by RUSVM agents Du Plessis, Mr. Fazio and Mr. Ramoutar, along with four security guards, and escorted him to Mr. Fazio's office.

44. On Monday, April 11, 2016 RUSVM handed Zara a letter informing him that he was being investigated pursuant to another false complaint Ferrari filed against him and in conjunction with his April 6, 2016 arrest. RUSVM suspended Zara in the interim, without a hearing, without being permitted to see evidence against him, or without being allowed to present evidence in his own defense.

8

45.  RUSVM never interviewed Zara himself regarding any of the allegations against him prior to or after initiating the investigation or prior to the disciplinary hearing.

46.  On Wednesday, April 13, 2016, RUSVM informed Zara that he must review all evidence against him and submit any evidence in his defense to the panel by eleven pm that night for a Friday, April 15, 2015 disciplinary hearing.  He was allowed only one hour to review the material the panel intended to present against him and was afforded no other advice or clarification to prepare for the hearing.

## V.  **RUSVM Policies and Procedures Governing Investigations and Discipline**

47.  RUSVM Handbook and Policy expressly covenants to provide the following expectations and rights to accused students in investigations and disciplinary proceedings:

48.  Handbook section 1.8.3, under Disciplinary procedures - Charges and Hearings, paragraph one ". . . that any charge of misconduct should be submitted as soon as possible after the event takes place."

49. Policy "All RUSVM colleagues (faculty, staff, administrators, and student workers) are required to immediately provide any information received about any actual or suspected sex and/or gender-based misconduct impacting the RUSVM community to appropriate officials with some very narrow exceptions discussed elsewhere in this policy (see "Confidentiality").

50.  RUSVM Handbook students accused of sexual misconduct the following rights: (section 1.10.13) "... a prompt, fair and impartial investigation will be initiated. If allegations are substantiated based upon the totality of the circumstances, the respondent may be subject to the code of conduct process..."

51. RUSVM Handbook guarantees students minimum notice for code of conduct charges, promising that "All charges shall be presented to the respondent in writing, in which a date and

time is set for a hearing within a timeframe reasonable under the circumstances, usually not less than two, nor more than 15 calendar days after the respondent has been notified of the charges."

52. RUSVM Handbook guarantees code of conduct disciplinary hearings will be free from conflicts of interest, stating "The Conduct Administrator may choose to hold the hearing him/herself, or may require a hearing by the full conduct panel when he/she believes that such a procedure is in the best interest of the University.  If either the complainant or the respondent believes that a member of the conduct panel has a conflict of interest, he or she should bring this concern to the attention of the Conduct Administrator, or if the alleged conflict is held by the Conduct Administrator to the attention of the location's Complaint Administrator (as identified in the Student Complaint Procedure published in this Student Handbook).

53. RUSVM Handbook section 1.8.3 Disciplinary Procedures Charges and Hearings promised that all RUSVM conduct panels must comply with certain protections relevant in Zara's case.

54. RUSVM Handbook 1.8.3, "the Conduct Administrator should serve as chairperson of the conduct panel, assuming no conflict of interest exists".

55.  Zara had the right to examine evidence against him, as "In advance of the hearing, both the complainant and respondent will be given access to the identified information that is available before the hearing which will be considered by the conduct panel"

56. Both the complainant and respondent have the right to present and cross-examine witnesses.

57. Evidence includes "Pertinent records, exhibits including video and written statements may be accepted as evidence for consideration by a conduct panel at the discretion of the Conduct Administrator/chairperson"

58.   There shall be a single record, such as an audio recording of all hearings    before a conduct panel or Conduct Administrator. The record shall be the property of the University. Suspensions and expulsions will be noted in the respondent's academic file.

59. RUSVM conduct panel's burden to consider conduct violation is "whether it is more likely than not that the respondent violated the Code of Conduct."

**VI.  <u>Zara's Investigation and Disciplinary Hearing</u>**

60.  Despite Handbook rules indicating that misconduct should be reported as soon as possible after events take place, Ferrari's complaints to RUSVM were not lodged until after several months to a year after she allegedly suffered a wrong.  RUSVM maintained Zara's fault despite this material breach.

61.  Despite Handbook rules indicating sexual misconduct investigations would be prompt, fair, and impartial, RUSVM did not question Zara at all during ongoing investigations.   Only Ferrari's allegations were investigated and RUSVM investigators entirely ignored Zara's side.

62. Despite Handbook rules indicating that the board should give a respondent a written notice of charges against him that contain a date and time for a hearing, RUSVM provided neither a writing listing the charges nor the date of the hearing on those charges.  In fact, Zara did not receive any actual writing in compliance with Handbook procedures to notify what violations RUSVM was pursuing.  Zara was only handed the April 11, 2016 writing stating he was being investigated and suspended.  RUSVM failed to provide a written statement of the actual charges.

63. Despite Handbook assurances that a code of conduct respondent must be notified in writing at least two days prior to the hearing, RUSVM notified Zara late April 13, 2016 that his hearing was scheduled for Friday, April 15, 2016.  Notice was not at least two days in advance; it

11

was less than forty-eight hours before the scheduled panel.  Notice of the date of the panel was not in writing.

64. Despite Handbook assurances that parties will have access to material to be presented at the panel, RUSVM scantly provided Zara with an opportunity to review the panel's information; he was provided with one hour, at the end of the day on April 13, 2016.  Zara was also informed in the afternoon on April 13, 2016 that he had to remit all of his evidence to the Panel by eleven at night the same day or the panel wouldn't consider his evidence.

65. Despite Handbook assurances that parties can present witnesses, RUSVM denied Zara a fair opportunity by refusing to listen to or consider his witnesses at the hearing.  For instance, RUSVM ignored witness statements, including the Wright's testimony on Zara's behalf.  RUSVM maintained Zara's fault despite testimony by the Wrights themselves that Zara did not trespass, verbally abuse, or act in a disorderly, disruptive, lewd or indecent manner at Starboard House at any time while a resident or thereafter.  RUSVM also failed to allow Zara to present information or proof that Ferrari's allegations both to RUSVM and St. Kitts police were fabricated in retaliation to the couple's break-up and her subsequent financial obligations related to her housing; instead, her allegations were taken as truth because she was a female.

66. Despite Handbook assurances to present witnesses, RUSVM silenced several potential witnesses prior to April 15, 2015 hearing when RUSVM threatened to charge the witnesses with ancillary code of conduct violations for participating on Zara's behalf.

67. Despite Handbook assurances with regards to appropriate evidence, RUSVM used statements and notes Mr. Fazio took during the investigation as testimony at the hearing, instead of obtaining signed, written statements by witnesses or actual on-site statements by willing witnesses to determine Zara fault on several allegations.  Such out of context notes and statements

were created in conjunction with the Mr. Fazio's comments to the witnesses that "they shouldn't be friends someone like" Zara and the RUSVM student witnesses needed to "reevaluate their relationship" with Zara.

68. Despite contractual guarantee of impartiality and protections against conflicts of interest, Mr. Fazio fulfilled multiple roles in the investigation and trial of Zara. Mr. Fazio was privy to the discussion Zara's mom had with Dr. St. Jean on the day Zara was assaulted by the police. Mr. Fazio watched the police video of Zara's attack with du Plessis contrary to RUSVM policy. Mr. Fazio drafted the allegations against Zara. Fazio was Zara's point of contact during his interim suspension pending the disciplinary hearing. Mr. Fazio conducted meetings with potentially involved parties prior to the hearing. And Mr. Fazio was at the helm of the RUSVM hearing that found Zara in violation of nine code of conduct violations despite biased, manipulated, and outdated complaints and evidence.

69. Despite evidence to the contrary and despite substantial procedural flaws, RUSVM issued a Notice of Expulsion against Zara on April 18, 2016, terminating his relationship with RUSVM, finding:

- Code of Conduct 1.6.3.3
  - Physical and Verbal Abuse of police officers – April 6, 2016 In Violation
  - Verbal Abuse of Mr. Dave Wright – April 6, 2016 In Violation
  - Verbal Abuse of Mr. Dave Wright – Nov–Dec 2016 (various dates) In Violation
  - Physical & Verbal Abuse, Intimidation Harassment of Ms. Alexa Ferrari In Violation May 2015–Dec. 2015 (various dates)
- Code of Conduct 1.6.3.4
  - Bullying of Ms. Alexa Ferrari – May 2015–Dec. 2015 (various dates) In Violation
- Code of Conduct 1.6.3.5
  - Damage to St. Kitt's Policeman's Uniform – April 6, 2016 In Violation
  - Damage of Ms. Alexa Ferrari's tires (slashed) – March 2016 Not In Violation
  - Damage of Ms. Alexa Ferrari's possessions at Ocean Edge Resort – May 2015 Not In Violation
- Code of Conduct 1.6.3.9
  - Resisting St. Kitt's Police arrest on April 6, 2016 In Violation
  - Fleeing St. Kitt's Police arrest on April 6, 2016 In Violation

- o Failing to comply with directions from Mr. Hazarie Ramoutar and Dr. Charles Wallace to not be present on the premise of the Starboard House. In Violation
- Code of Conduct 1.6.3.10
  - o Present on the premise of the Starboard House after receiving ban from property manager Mr. Dave Wright and from on-campus meeting with Mr. Ramoutar and Dr. Wallace. In Violation
  - o Unauthorized entry in the Mr. and Mrs. Dave Wright on Dec. 1, 2015 In Violation
- Code of Conduct 1.6.3.11
  - o Dating violence against Ms. Alexa Ferrari – May 2015–Dec. 2015 In Violation
- Code of Conduct 1.6.3.12 In Violation
- Code of Conduct 1.6.3.17
  - o Disorderly, disruptive, lewd or indecent; breach of peace – April 6, 2016 In Violation
  - o Disorderly, disruptive, lewd or indecent; breach of peace, In Violation
  - o Ocean Edge Resort – May 2015
  - o Disorderly, disruptive, lewd or indecent; breach of peace, Starboard House In Violation various dates Summer 2015-Dec. 2015
- Code of Conduct 1.6.3.18 In Violation

**VII. Appeal of the Sanction**

70. Zara filed a timely appeal pursuant to his rights in the Notice of Expulsion dated April 18, 2016 (Notice attached as evidence). Zara's appeal is pending.

## <u>FIRST CAUSE OF ACTION</u>
### (Against Defendant RUSVM)

### *VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, 20 U.S.C. §§ 1681 et seq.*

71. Zara incorporates by reference each of the paragraphs above as if fully set forth herein.

72. Title IX of the Education Act Amendment of 1972, 20 U.S.C. § 1681, et seq ("Title IX"), states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

73. Title IX permits an implied right of action affording an individual discriminated against due to his or her gender monetary damages and equitable relief.

74. RUSVM receives federal funds and is subject to Title IX.

14

75. Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to adopt and publish grievance procedures providing for the prompt and equitable resolution of student...complaints alleging any action which would be prohibited by Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. §40 54.135(b) (Dep't of Justice) (emphasis added).

76. The procedures adopted by a school covered by Title IX must not only ensure the Title IX rights of the complainant, but must also accorded due process to both parties involved...

- Notice . . . of the procedure, including where complaints may be filed ;
- Application of the procedure to complaints alleging [sexual] harassment...;
- Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence;
- Designated and reasonably prompt timeframes for the major stages of the complaint process; and
- Notice to the parties of the outcome of the complaint...

77. RUSVM has deprived Zara, on the basis of his sex, of his rights to due process and equal protection through the improper administration of and/or the existence, in its current state, of RUSVM's guidelines and regulations that are purposely intended to disproportionately affect male students.

78. RUSVM violated Zara's statutory right to be free from discrimination on the basis of sex by subjecting Zara to investigative and disciplinary proceedings which were conducted in a manner that was biased against the male student.

79. RUSVM violated Zara's statutory right to be free from discrimination on the basis of sex when it showed actual knowledge by selectively enforcing RUSVM provisions against him while exhibiting deliberate indifference to RUSVM conduct violations committed by Ferrari when he reported that she attacked and bit him in October 2015; when she spread false and malicious lies about him from December 2015 through the current time; when she filed false and dangerous

reports against him, knowing the St. Kitts' police had a propensity for violence; and when she filed false complaints with RUSVM for the purpose of damaging his career.

80. RUSVM's stated policies and procedures, together with its violations thereof only with respect to Zara as the male accused of sexual assault, demonstrates RUSVM's gender-biased practices with respect to males accused of sexual assault. RUSVM punished Zara more severely than a similarly situated female student would have been punished. In fact, when Ferrari was the similarly situated female, security instructed Zara to simply ignore her and didn't even initiate a complaint on Zara's behalf. Nor did RUSVM pursue an investigation or disciplinary action against any of the egregious behavior she demonstrated following their breakup in October 2015 through today.

81. RUSVM has created an environment where an accused male student is fundamentally denied due process by being investigated and prosecuted through the conduct process under a predetermined presumption of guilt. Such a one-sided process deprived Zara, as a male student, of educational opportunities at RUSVM on the basis of his sex.

82. As a direct, proximate and foreseeable consequence of RUSVM's numerous material violations of due process and Title IX procedural mandates, Zara has sustained significant damages including, but not limited to, having an academic and/or disciplinary record(s) that improperly includes a notation indicating that he was found to have committed serious conduct sanctions including dating violence; disorderly, disruptive, and lewd breach of peace; unauthorized entry; bullying; resisting arrest, and other related offenses.

83. This black mark on Zara's record inhibits or destroys his ability to enroll in a similarly ranked and esteemed college or university and stigmatizes Zara as he maintains a record that notes

findings of guilt for conduct he did not commit. Zara has also suffered monetary damages, loss of education opportunities, and other direct and consequential damages.

## SECOND CAUSE OF ACTION
### (Against Defendant RUSVM)

### *Breach Of Contract*

84. Zara incorporates each of the above paragraphs as if fully set forth herein.

85. Illinois imposes contract on the relationship between students and universities. The catalogues, bulletins, circulars, and regulations of a university made available to the matriculant become part of the contract.

86. RUSVM was required to act in accordance with the Student Handbook and College Bulletin in addressing complaints of general and sexual misconduct

87. RUSVM gives certain contractual rights to students accused of general or sexual misconduct, which includes rights set forth in paragraphs 47-57 herein.

88. RUSVM acted illegally, arbitrarily, capriciously, and in bad faith when it failed to thoroughly, competently, and impartially investigate and process the false allegations of misconduct filed against Zara.

89. RUSVM continued to act illegally, arbitrarily, capriciously, and in bad faith when it condoned and supported the discriminatory hearing against Zara when it violated Handbook policies as described in paragraphs 58-67 herein, thereby violating Zara's contractual rights.

90. As a direct, proximate and foreseeable consequence of RUSVM's numerous material breaches, Zara has sustained significant damages including, but not limited to, having an academic and/or disciplinary record(s) that improperly includes a notation indicating that he was found to have committed serious conduct sanctions including dating violence; disorderly, disruptive, and lewd breach of peace; unauthorized entry; bullying; resisting arrest, and other related offenses.

91. This black mark on Zara's record inhibits or destroys his ability to enroll in a similarly ranked and esteemed college or university and stigmatizes Zara as he maintains a record that notes findings of guilt for conduct he did not commit. Zara has also suffered physical and emotional damages monetary damages, loss of education opportunities, and other direct and consequential damages.

**THIRD CAUSE OF ACTION**
**(Against Defendant RUSVM)**

*Negligence*

92. Zara incorporates each of the above paragraphs as if fully set forth herein.

93. Zara believes that RUSVM's Handbook and College Bulletin are binding contracts and that Zara has materially breached multiple provisions therein relating to disciplinary proceedings in this case.

94. However, in the event the Court were to find that no such contracts exist, RUSVM owed duties of care to Zara independent of any contractual duties including, but not limited to:

> a) To ensure that its policies and procedures concerning dating violence and general misconduct are fair and reasonable;
> b) To ensure that its policies and procedures concerning dating violence and general misconduct are compliant with applicable federal/state law, namely, but not limited to, Title IX;
> c) To adequately train its administration, staff, employees and representatives of such policies and procedures concerning sexual misconduct; and
> d) To ensure that its administration, staff, employees and representatives adhere to such policies and procedures.

95. Based on the aforementioned facts and circumstances alleged in paragraphs 58-67, RUSVM has breached its duties of care owed to Zara.

96. As a direct, proximate and foreseeable consequence of RUSVM's numerous material breaches of duty, Zara has sustained significant damages including, but not limited to, having an academic and/or disciplinary record(s) that improperly includes a notation indicating that he was

found to have committed serious conduct sanctions including dating violence; disorderly, disruptive, and lewd breach of peace; unauthorized entry; bullying; resisting arrest, and other related offenses.

97. This black mark on Zara's record inhibits or destroys his ability to enroll in a similarly ranked and esteemed college or university and stigmatizes Zara as he maintains a record that notes findings of guilt for conduct he did not commit. Zara has also suffered physical and emotional damages, monetary damages, loss of education opportunities, and other direct and consequential damages.

## FOURTH CAUSE OF ACTION
### (Against All Defendants)

### *Intentional Infliction of Emotional Distress*

98. Zara incorporates each of the above paragraphs as if fully set forth herein

99. Based on Ferrari's intentionally and/or with willful or wanton indifference to the truth and aware of RUSVM's warning about the corrupt and untrusting nature of St. Kitts police, Ferarri filed a false police report with St. Kitts police. Ferrari was aware of the legal, physical, and dangerous ramifications of her actions that she was putting Zara in harm's inevitable way.

100. Both Defendants RUSVM and Ferrari intentionally and/or with willful or wanton indifference to the truth, engaged in conduct to expel Zara from RUSVM in extreme indifference as to the truth of the allegations being made by St. Kitts Police and Ferrari and without evidence in support of Ferrari's belated claims or considering Zara's dire and fearful actions with respect to the abuse he endured at the hands of St. Kitts police.

101. The above actions and inactions by RUSVM were so outrageous and utterly intolerable that they caused mental anguish and severe psychological and emotional distress to Zara, as well as physical harm at the hands of St. Kitts Police, financial loss, humiliation, loss of

reputation, and other damages. No reasonable person could be expected to endure sustaining severe police beatings and being fearful for his life as a result of patently false accusations, followed by termination of his education and career dreams resulting from the abusive police practices and related false institutional allegations.

102. As a direct, proximate and foreseeable consequence of RUSVM and Ferrari's willful and wanton indifference to the truth and subsequent actions therein based, Zara has sustained significant damages including, but not limited to, having an academic and/or disciplinary record(s) that improperly includes a notation indicating that he was found to have committed serious conduct sanctions including dating violence; disorderly, disruptive, and lewd breach of peace; unauthorized entry; bullying; resisting arrest, and other related offenses.

103. This black mark on Zara's record inhibits or destroys his ability to enroll in a similarly ranked and esteemed college or university and stigmatizes Zara as he maintains a record that notes findings of guilt for conduct he did not commit. Zara has also suffered physical and emotional damages, monetary damages, loss of education opportunities, and other direct and consequential damages.

### FIFTH CAUSE OF ACTION
**(Against Defendant Ferrari)**

#### *Tortious Interference With Contractual Relationships*

104. Zara repeats and realleges each and every allegation made in the foregoing paragraphs as if fully set forth herein.

105. At all times relevant, Zara had valid and existing contractual relationships with the RUSVM.

106. At all times relevant, Ferrari had knowledge of Zara's contractual relationship with the University, as she knew Plaintiff was a student enrolled at the University.

107. Ferrari engaged in intentional acts intended or designed to disrupt and/or prevent such contractual relationships, including the reporting false allegations against Zara to the University with the intent of getting Zara dismissed from veterinary school.

108. Ferrari's intentional acts in filing false St. Kitts police reports and false RUSVM conduct violations interfered and disrupted and/or prevented Zara from attending classes at the RUSVM, thus halting and destroying his ability to become a veterinarian.

109. As a direct, proximate and foreseeable consequence Ferrari's intentional actions designed to meddle with Zara's and RUSVM's contract, Zara has sustained significant damages including, but not limited to, having an academic and/or disciplinary record(s) that improperly includes a notation indicating that he was found to have committed serious conduct sanctions including dating violence; disorderly, disruptive, and lewd breach of peace; unauthorized entry; bullying; resisting arrest, and other related offenses.

110. This black mark on Zara's record inhibits or destroys his ability to enroll in a similarly ranked and esteemed college or university and stigmatizes Zara as he maintains a record that notes findings of guilt for conduct he did not commit. Zara has also suffered physical and emotional damages monetary damages, loss of education opportunities, and other direct and consequential damages.

## DAMAGES

111. Zara repeats and realleges each and every allegation made in the foregoing paragraphs as if fully set forth herein.

112. As a direct and proximate result of RUSVM and Ferrari' actions, Zara has lost the difference in value over a lifetime of earnings expected to be earned by an individual who graduated from RUSVM and Zara's earning capacity without a medical degree from RUSVM.

113. As a direct and proximate result of RUSVM and Ferrari' actions, Zara has lost tuition he paid to RUSVM.

114. As a result of the RUSVM and Ferrari's actions committed against Zara, he has suffered loss, damage and detriment; including incidental and consequential damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

115. It has been necessary for Zara to obtain the services of an attorney to prosecute this action, and Zara is entitled to an award of attorney's fees and costs of suit incurred herein.

WHEREFORE, Zara prays that this Honorable Court enter judgment in Zara's favor, and against Defendants, for (1) an injunction requiring RUSVM to reinstate Zara into his program; (2) compensatory damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00); (3) the costs and disbursements of this action, for interest, and such other attorney's fees and further relief as justice requires; and (4) any other relief that justice so requires.

DATED this 27th day of May, 2016.

THE BACH LAW FIRM, LLC

/s/ Jason J. Bach
Jason J. Bach, Esq.
7881 W. Charleston Blvd., Suite 165
Las Vegas, Nevada 89117
Telephone: (702) 925-8787
Facsimile: (702) 925-8788
Email: jbach@bachlawfirm.com