# EXHIBIT C

EASTERN CARIBBEAN SUPREME COURT

ST. KITTS AND NEVIS

NEVIS CIRCUIT

## IN THE HIGH COURT OF JUSTICE

CLAIM NO. NEVHCV2003/0096

BETWEEN:

### PINA PANCHAL

Claimant

and

### MEDICAL UNIVERSITY OF THE AMERICAS LIMITED

Defendant

Before:

Ianthea Leigertwood-Octave                          High Court Judge

Appearances:

Ms. Althea Jarrett for the Claimant.

Mr. Jeffrey Nisbett for the Defendant.

-------------------------------------------

2006:    September 25, 26, 27

2011:    March 28.

-------------------------------------------

### JUDGMENT

Introduction

[1]    **LEIGERTWOOD-OCTAVE J[Ag.]:** In 2001, the Claimant ["Miss Panchal"] enrolled as a student in the Doctor of Medicine Degree Programme at the Defendant institution, the Medical University of

1

the Americas Limited ["the University"] here in Nevis. As a student, Miss Panchal was governed by the University's Honour Code, which included provisions relating to the procedure to be followed when there was an alleged violation of the Code.

[2]     On 10th December 2002, Miss Panchal wrote a pharmacology examination. She was later informed by the Dean of the University that some students, whose names were not disclosed, had complained that she had cheated during the examination. She was required to resit the examination.

[3]     She was subsequently ordered to attend a meeting of the Disciplinary Committee on 16th January 2003. In a letter of 24th January 2003, the acting Dean of the University informed Miss Panchal that he had reviewed the Disciplinary Committee's report including its finding that she had cheated during the Pharmacology examination and its recommendation that she be expelled from the University. He had accepted the Disciplinary Committee's recommendation as being appropriate and fair and he also informed her that she was expelled from the University for academic dishonesty, with immediate effect. In addition, her transcript would record a failing Grade F for her Pharmacology examination and that she had involuntarily withdrawn from the Medical Degree Programme.

[4]     Ms. Panchal's attempts to have the decision rescinded both by way of appeal and rehearing were unsuccessful. She subsequently commenced this action alleging breach of contract by the University, as in dealing with her expulsion the University had failed to comply with the procedures set out in the Honour Code and with the rules of natural justice. She claimed damages for the breach; a declaration that the University's decision to expel her was unlawful, null and void; and mandatory injunctions directing the University remove from her transcript the record that she had withdrawn from the University involuntarily and to record the grade that she received on her first sitting of the Pharmacology examination as her permanent grade for that course.

[5]     In its Defence the University accepted that the Honour Code set out regulations in relation to academic honesty and disciplinary procedures but denied that it had failed to observe the procedural safeguards in the Honour Code. The University also denied that it had breached its contract with Miss Panchal or failed to observe the rules of natural justice. Their case is that during her tenure at the University, Miss Panchal had engaged in a pattern of academic dishonesty and

2

that she had been warned of her dishonesty and in reviewing the matter in its entirety, she had been properly expelled from the University.

**The Issues**

[6]     The issues to be determined are:

1. Did the University breach its contract with Miss Panchal?

2. Did the University fail to observe the procedural safeguards contained the Honor Code and/or breach the rules of natural justice in the process leading Miss Panchal's expulsion?

3. Did Miss Panchal cheat on Pharmacology examination on 10th December 2002?

**The Honor Code**

[7]     The Honor Code which is central to the issues in this case, is to be found in the "**Medical University of the Americas Student Handbook** *Integrity in Education*"[1], which is stated to have been prepared for the convenience of the medical students at the University. It is also stated that in case of any divergence from or conflict with the bylaws or policies of the University, the official bylaws or policies shall prevail.

[8]     I think that this is an appropriate juncture to set out the relevant provisions of the Honor Code which come into play and which set up the background to the claim:

> '*Consequences of Suspected or Observed Academic Dishonesty*
>
> *I.*     *Steps to Take When a Possible Honor Code Infraction is Suspected*
>        *A. Any person with knowledge of academic dishonesty should submit a written statement of such allegations to the Dean who has the authority and responsibility for the administration of student discipline. It shall be the duty of the Dean to investigate allegations of Honor Code infractions.*
>        *B.* ...
>        *C. The following actions should be taken if an examinee is suspected of giving, copying, or otherwise exchanging unauthorized information about the content of the examination while it is in progress:*
>           *1. Allow the examinee to complete the examination.*
>           *2. Confirm the observation with at least one other professor.*
>           *3.* ...

---

[1] Bundle of Documents pp 71-138

3

II.    *Honor Code Reporting Procedures*
    A. *Initiation of Complaints*
        1. *Complaints about potential Honor Code violations may be initiated by personnel with the University (students, faculty, staff, and administration) or by external sources…*
        2. *The initial complaint may be reported to the student's advisor or directly to the Dean.`*

    B.   *Role of the Dean*
        1. *The Dean will conduct an initial investigation of the complaint and determine its merit and elect to:*
            a. *Recommend that a formal Honor Code violation be charged and report the recommendation to the Student Disciplinary Committee.*
            b. …
            c. …
            d. …
        2. *In all cases, the Dean will inform the student in question of the existence and nature of the complaint. The student will be informed of any investigation and of his/her right to refrain from participation in the investigation. The student will be informed of what action will be taken following the completion of the initial investigation. …*
        3. …
        4. …

III.   **Procedural Safeguards in the Honor Code Procedure**
    A. *The hearing of all charges shall take place promptly, ordinarily within 10 days following the presentation of charges to the student. At least 72 hours before the meeting, the student shall be given the following: (1) notice to appear, (2) written notice of the charge, (3) a written text of the regulations that he/she is accused of violating, (4) the Dean's report, (5) a statement of the student's procedural rights, (6) a list of the members of the Disciplinary Committee and (7) any other materials that the Disciplinary Committee instructs the Dean to supply the student. The student may apply for additional time to prepare for his/her defense by petitioning the Chairman of the Disciplinary Committee. The student may also waive the notice and the 72 hours notification period.*
                1. …
                2. …
                3. …
                4. *A material witness is a person having direct and relevant knowledge regarding the case being heard. The Dean may require the appearance of material witnesses. The student or complainant may also submit a written request for the appearance of material witnesses to the Dean. …*
                5. *The student has the right to examine the written statement of any witness relevant to his/her case at least 72 hours before the hearing. At the hearing, the student has the right to face any witness who has*

4

> *provided relevant statements regarding his/her case,*
> *providing that the witnesses' attendance can be*
> *secured.*

IV.     **The Verdict**

    A.  *After hearing the evidence and summations offered by the parties, the*
    *Disciplinary Committee shall consider its verdict and judgment in closed*
    *session…*

    B.  …

    C.  *The Disciplinary Committee shall promptly inform the Dean, in writing, of the*
    *decision of the Committee. The Dean, in turn, shall then promptly notify the*
    *student of the decision, as well as his/her rights of appeal.*

VII.    **Sanctions**

    …

    **Expulsion:** *Dismissal from the University with the recommendation that the*
    *person never be readmitted.*

**The Evidence**

[9]    Miss Panchal, was one of 40 students in the 4th semester who sat the final pharmacology examination on 10th December 2002. The course director for pharmacology and proctor for that examination was Dr. Stan Willenbring, who gave evidence on behalf of Miss Panchal.

[10]   Dr. Willenbring's evidence is that during the examination, Miss Panchal sat at the back of the classroom and to his right. He denied in cross-examination that he had ever been instructed that Miss Panchal should sit at the front of the room. Student Vanh Luangphakdy was seated diagonally and in front of Miss Panchal. Students Steve Randall and Nastane Bernard were seated near the very front in the row farthest to Dr. Willenbring's right. Van Luangphakdy and Miss Panchal did not have the same version of the examination, a fact that he alone knew.

[11]   During the examination, Dr. Willenbring had a clear view of the room and he did not leave the classroom. Students only left the room when they had completed and handed in their examination. He was never beyond the range of being able to clearly hear any talk that would have occurred in the classroom. He kept a watchful eye on Miss Panchal because soon after he had matriculated as a faculty member at the University, he had been told by Drs. Danny Burns and William Cornell, who was then the Acting Dean, that she had been previously accused of cheating. They had suggested that he watch her closely because they had said she was a known cheater. He had

5

therefore always positioned himself to have a clear view of Miss Panchal from his seat and he watched her even closer than the other students. He had never observed Miss Panchal cheating or behaving suspiciously in any of his exams. He stated in his witness statement "*at no point during the 4th semester did I have any reason to believe that Pina Panchal had engaged in cheating behaviours during any of my examinations.*"

[12] In amplifying his witness statement, he was asked specifically whether he had noticed anything at all about Miss Panchal's behaviour during the pharmacology examination on 10th December 2002, he replied '*[n]othing unusual. She was just working on her exams like anyone else in the room.*"

[13] Dr. Willenbring stated that he was later approached by Nastane Bernard and Steve Randall who each complained that Miss Panchal had been cheating on the pharmacology examination by viewing Van Luangphakdy's scantron answer card. He told them that this was not possible as Miss Panchal and Mr. Lvangphudy had different versions of the examination. He had subsequently compared the two scantrons and found only a 10% homology between them.

[14] On two other occasions that same day, one in Dr. Vijay Aswani's office and the other near Dr. Willenbring's apartment, Steve Randall had again complained of Miss Panchal's cheating. On the first occasion he complained that she had actually been looking at Van Luangphakdy's copy of the written examination and the second time he stated that it was a cooperative effort in which Van Luangphakdy was actively providing answers to Miss Panchal by holding up his exam for her to read, the latter complaint was accompanied by a demonstration of what he claimed had taken place.

[15] Dr. Willenbring had reservations about the complaints, which were advanced in three versions and in addition he had never observed Van Luangphakdy holding up his test booklet or Miss Panchal looking at it and neither Steve Randall nor Nastane Bernard had tried to alert him of any problem or direct his attention to Miss Panchal during the examination.

[16] Questions put to Dr. Willenbring at the beginning of his cross-examination were all related to his departure from the University. He denied that he had left the University without telling anyone. He stated that he had been terminated under an "*At Will Employment Law*" by the US entity that had hired him before he could give notice. He had in fact left Nevis before the date scheduled for one of

6

his exams but he had prepared the exams and the answer keys and made the necessary copies and left them for the University to administer.

[17]     His attentiveness in the proctoring of the pharmacology examination on 10th December 2002 was challenged. He admitted that he was the only faculty supervising forty students. He recalled four instances where students, including Miss Panchal, had sort clarification on some aspect of the examination.   Mr. Nisbett questioned his ability to observe all that was happening as follows:

> "Q:     Now I am suggesting to you that on these occasions when you were assisting other students, isn't it possible that you were not observing Ms. Panchal enough?
>
> A:     For perhaps as long as a minute or two not very long. In one case I would have been standing right next to her, in the other case which would have been at the very beginning of the exam, which is the section which I don't even believe it would have been possible for her to cheat because there were no answers on the other person's test.
>
> Q:     Dr. Willenbring, you would agree with me that there were occasions when you would have taken your eyes off of Ms. Panchal.  I mean there are 39 other students that you are looking at, isn't that so?
>
> A:     Brief moments when I answered these questions for the other students otherwise I was sitting in front of the classroom looking at the class.  It would be hard not to see Ms. Panchal.  She was virtually in the center of the room."

[18]     He was referred to his statements on the issue before the Disciplinary Committee. He agreed that he had said anything is possible when asked by Dr. Allerton whether it was not possible that if he looked away for a moment cheating could take place but he maintained that he did not look away long enough for that level of cheating as alleged to have taken place without him seeing it.

[19]     In relation to the complaint that Miss Panchal had cheated by looking at Vanh Lvangphudy's exam, he stated that the opportunity to do so was very limited because although other students asked for clarification, there were only a few questions. Further, when he answered those questions they would have had to turn multiple pages in order to carry out the cheating that is alleged to have occurred and he did not think that could have happened with him standing right next to them and he would not have noticed.

[19]     Miss Panchal's evidence was that at 4.00 o'clock on the afternoon of 11th December 2002, the day after the pharmacology examination, she was informed by the Dr. Cornell, the acting Dean, that

she had to re-sit the exam. Dr. Cornell did not give any reason for the re-sit but told her that if she did not comply she would get a failing grade.

[20]   On 16th January 2003, she received a letter dated 15th January 2003 from Dr. Ron Allerton. The one paragraph letter read as follows:

> "Ms. Panchal:
>
> Your presence is ordered at a meeting of the Disciplinary Committee of the Medical University of the Americas. This meeting will be held in the faculty lounge at the library at 4:15 P.M. on Thursday, 16 Jan 2003.
>
> For the Disciplinary Committee,"

[21]   She did not receive written notice of the charges made against her or a copy of the Dean's report of his investigation of any complaints made against her. She also did not receive a statement of her procedural rights or a list of the members of the Disciplinary Committee.

[22]   Dr. Allerton's evidence is that is was Dr. William Cornell, the Acting Dean at the time who recommended that an Honour Code violation be charged against Miss Panchal. He knew nothing of Dr. Cornell's investigations into any complaints made against Miss Panchal. Dr. Cornell had given him the relevant instructions, although he could not recall if they were written or verbal, to convene a meeting of the Disciplinary Committee.

[23]   In his witness statement he admitted that Miss Panchal had been given 24 hours notice and not 72 hours notice of the hearing of the disciplinary charges against her. He explained that he had been in touch with her in the days leading up to the hearing and as Chairman of the Disciplinary Committee and he had been keeping her informed of the pending date. She had complained about the delay in the proceedings. In his opinion, Miss Panchal did have more than the minimal 72 hours notice because he had personally told her of tentative dates and times of the imminent meeting. On several occasions he had informed and updated her on the pending schedule relating to the hearing well in advance of the 72 hour minimum notice.

[24]   Dr. Allerton who was chair of the Disciplinary Committee could not recall if the Committee had a written report from Dr. Cornell at the hearing on 16th January 2003. He recalled that regarding the complaints against Miss Panchal there were independent written statements from Steve Randall

8

and Nastane Bernard but he could not say whether Ms. Bernard's statement was before the Committee at the hearing. He spoke of statements from faculty members who stated that they were sure Miss Panchal was cheating but they had never caught her in the act.

[25]     His conclusion on the hearing was:

>  "My strong recall of the Panchal matter is that it was one of the more intense considerations before the Committee in those days. However, the Committee was unanimous and solid in its determination, as set out in the letter of recommendation. Each member of the [sic] approached the hearing with an open mind with no [p]re-conceived expectations of the outcome of the matter. The Committee exercised careful rationality and logic and looked at the evidence and testimony in a thoroughly dispassionate manner, affording a fair hearing to Ms. Panchal."

[26]     Dr. Willenbring attended the hearing and from his witness statement it would appear that he told the Committee essentially what he said in his evidence in this trial. In a nutshell, he had not observed any cheating in the exam, Vanh Luangphakdy and Miss Panchal had different versions of the exam, which contained the same questions arranged in a different order, both Steve Randall and Nastane Bernard sat at the front of the class while Miss Panchal was at the back making doubtful that they could have seen her cheating. He also expressed the view that students making the complaints had changed their description of the event several times. The Committee accepted his statements with further enquiry or comment.

[27]     Dr. Danny Burns, Assistant Dean for Academic affairs at the University relied on a statistical calculation to support his contention that Miss Panchal had cheated on the pharmacology examination. He found that the student in front of her missed only six questions. Of those six incorrect responses, Miss Panchal missed five of the same questions with the exact same incorrect responses.

[28]     Dr. Willenbring did not find it either odd or unusual that they both chose the same wrong responses for the final six cases on a multiple choice exam. In his view it was almost predictable. He had taken a course of Test and Measures for Academic Testing where he had looked at those issues and he did not agree with Mr. Nisbett that identical wrong answers would not be a useful indicator of academic dishonesty. He explained that it does not have any value if the multiple choice test is written with strong distracters in it because you expect the large number numbers of students who

9

would get the question wrong to have picked the same wrong answers. That is the way tests are written and it is part of the business of Tests and Measures.

[29] Dr. Burns who stated that he had received specific training and practical expertise in this field refuted Dr. Willenbring's conclusion maintaining that statistical calculations are very useful for determining cheating. He had even developed software addressing that particular question. On a well-designed test 70% or 75% of students choose the right answer, leaving 25% to choose among four possible wrong answers, which are referred to as distracters. In his experience, the typical average distracter is far less than 20%, more like 13% or 15%. He chose 20%, one in five to be generous with the probabilities and to be conservative with his estimates of what was the unlikelihood of a student getting five in six exact incorrect responses and at the minimum in his view the probability of this would be less than 1in 3,125. When he looked at clusters of five questions per student taking test at the University, the probability ranged anywhere from 1 in 10,000 to 1 in 100,000.

[30] His conclusion was that even though Miss Panchal could not have simply "copied" from Vanh Lvangphudy's answer sheet because the sequence of test items were different, it seemed highly likely that she did indeed copy from his test (more precisely it seems highly unlikely that the same sequence of incorrect answers was arrived at by chance).

**The Breach of Contract Issue**

[31] There are certain matters that do not appear to be dispute and one is it that a contractual relationship existed between Miss Panchal and the University and that the Honor Code formed part of that contract. It is however the University's position that it is not in breach of that contract. The University's main argument is that once the Court is satisfied that Miss Panchal cheated on her December 2002 Pharmacology exam, even it finds that there have been procedural irregularities in the disciplinary process, she could not succeed in her claim.

**Did the University breach the rules of natural justice in the process leading up to Miss Panchal's expulsion**

[32]    Mr. Nisbett accepted in his submissions that the proceedings before the Disciplinary Committee was not perfect but then again they need not be. He relied on **Ward v Bradford Corporation**[2] in support of his submission where Lord Denning MR stated that "*we must not force disciplinary bodies to become entrammelled in nets of legal procedure*". The Master of the Rolls went on set the test to be applied was whether the disciplinary body act had acted fairly and justly.

[33]    **Ward** not only sets down the test which remains unchallenged but it is also of interest to some legal writers. In his review[3] of the book "**Justice, Lord Denning and the Constitution**[4]", Allan C. Hutchinson of the Faculty of Law, University of Newcastle upon Tyne, wrote that Lord Denning has smuggled his own rigid code of morals unto the bench: "*the most revealing example of Denning's Victorian sense of morality is to be found in Ward v Bradford Corp (1972) 70 L.G.R. 27 at 35. The case involved a woman teacher who had been expelled from training college for allowing a man to stay a night in her room. Lord Denning said: This is a fine example to set for others! And she a girl in training to be a teacher! I expect the governors and staff all thought she was and unsuitable person... She would never make a teacher ...No person would knowingly entrust their child to her care*".

[34]    In light of Lord Denning's moralistic views, it is worth considering whether or not those may have influenced his findings in the case. I agree with the principle in **Ward**[5] but the effect of the procedural flaws must be related to the facts and circumstances of each case.

[35]    In my view the governing body in **Ward**[6] must be distinguished from the case at bar. The governing body had been careful to act properly. Even though they had changed the rule which allowed it to bring the complaint to the disciplinary committee instead of the principal, the court found that there was no evidence that the student had been treated in any way which was unjust or unfair and

---

[2] [1972] 70 L.G.R. 27
[3] Supreme Court Law Review Vol. 3:565 at page 5
[4] Edited by P. Robson and P. Watchman Glover Publishing Co. Ltd. 1981

[5] Supra.
[6] Supra.

11

therefore the injunction restraining her expulsion was refused. In **Ward**, there was dispute that the gentleman had in fact spent the night but in our case Miss Panchal has denied that she cheated.

[36] In this case Miss Panchal was never notified of the charges against her until she was actually at the disciplinary hearing. She was not provided with the Dean's report which ought to have included his recommendation to send the matter on to the Disciplinary Committee. She was given less than 24 hours notice to attend a Disciplinary Hearing, which could lead to her expulsion, with no time available for her to prepare her defence. The notice of the hearing did not even indicate in what capacity she was required to attend.

[37] Dr. Allerton's statements that they had these conversations on the matter and that she was aware of what was happening even if taken to true do not include any reference to the fact that he had told her what alleged Honor Code infractions or what charges she faced. She was not given the statements of the material witness prior to the meeting. She was not afforded the opportunity to face her accusers on the day of the hearing as the committee. She did not have the benefit of any of the procedural safeguards in the Honour Code. There is no evidence that she waived any of these safeguards. In addition at the hearing the Committee relied on Dr. Burns technical expertise at a hearing of which Miss Panchal was notified merely hours before it took place.

[38] I cannot see how these circumstances could fall within Lord Denning's contemplation in **Ward.** I am satisfied that there have been there has been substantial non-compliance with the procedure set out in the Honor Code and breaches of the rules of natural justice and when looked at in their totality, I must conclude that the Disciplinary Committee did not act fairly or justly. The essence of the procedural safeguards were absolutely and completely disregarded and the process was skewed to result in injustice to Miss Panchal.

**Did Miss Panchal cheat on the Pharmacology examination?**

[39] The University's submission is that if the court finds that Miss Panchal cheated on the pharmacology examination, event with a finding of procedural and natural justice breaches, her claim should be dismissed.. Unlike the tribunal, who actually had statements from the complainants themselves to consider in their deliberations, this court can only consider the evidence of Miss Panchal, Dr. Willenbring and Dr. Danny Burns on this issue.

12

[40]     I find no basis to doubt Dr. Willenbring, who was the proctor of the examination. Dr. Allerton himself admitted that he had no substantial challenge to Dr. Willenbring's evidence. There seemed to be some attempt to suggest that he had problems with the University which gave a hint that this could possibly have some bearing on his evidence but this was not pursued. Dr. Allerton himself stated that he accepted Dr. Willenbing's statements. Dr. Willenbring did not seen any indication that Miss Panchal had cheated or attempted to cheat on the pharmacology exam and he was adamant that he had kept her under close scrutiny.    I am not in a position to say what written statements the Disciplinary Committee considered regarding complaints made against Miss Panchal. A statement of Steve Randall dated 14th January 2003, is included in the Bundle of Documents but I have attached no weight to it as it was not identified by Dr. Allerton as the statement which was before the Disciplinary Committee hearing on 16th January 2003.    He was actually quite unsure as to what statements were before the Committee at all.

[41]     Dr. Burns has provided the court with very interesting statistical analysis and conclusions but I find it difficult to rely on his evidence solely to make a determination that Miss Panchal cheated during the exam. He has concluded that it is highly likely that she did because it is extremely unlikely that she and Vanh Luangphakdy would have chosen the same five incorrect answers out of six questions. Dr. Burns' conclusion is highly scientific but theoretical nonetheless. Re-enacting the examination conditions as to the layout of the room and the positions of the students is helpful but not conclusive.   He was not present during the examination and without even a shred of evidence that Miss Panchal had acted suspiciously, been observed doing something that could lead to a conclusion that she was cheating or attempting to cheat, it does not assist me in coming to a conclusion.

[42]     It is clear from Dr. Allerton, Dr. Burns and Dr. Willenbring that there was some consensus that Miss Panchal was a cheat.   In their evidence they refer to prior accusations, Dr. Burns to referred multiple complaints, and there were comments that some faculty were sure that she was cheating but they had never caught her.   It is not difficult to conclude that there pre-conceived ideas about Miss Panchal befoe the Disciplinary Committee hearing on 16th January 2003.Whatever the unsubstantiated allegations, Miss Panchal was expelled from the University for cheating in the pharmacology examination on 10th December 2002 and in my view the evidence does not support such a finding on a balance of probabilities.

13

**The Claim for Special Damages**

[43] I note that the Defendants written submissions did not contain any objections to the claim for Special Damages or the supporting documentation. I take it that there is no challenge to the amounts claimed.

**Order**

[44] In light of my findings at paragraphs [38 ] and [42 ], I make the following orders:

1. Judgment is entered for the Claimant, Miss Panchal.
2. Miss Panchal is awarded damages for breach of contract in the sum of US$43,260.95.
3. The decision of the University to expel Miss Panchal is declared to be unlawful, null and void.
4. The University is ordered to clear Miss Panchal's transcript of any record that she withdrew from the University involuntarily.
5. The University is ordered to record the grade that Miss Panchal received for her Pharmacology Examination on December 10th December 2002 as her permanent grade.
6. The University is to pay Miss Panchal prescribed costs in accordance with Rule 65.5 and Appendix C of the Eastern Caribbean Civil Procedure Rules 2000 on the sum of US$43,260.95.

Ianthea Leigertwood-Octave

High Court Judge

14